DEPOSITION OF DAN J. FINTEL, M.D.
CONDUCTED ON MONDAY, SEPTEMBER 29, 2003

1 (Pages 1 to 4)

---

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
 2
 3
 4   JUDITH A. EVANS, et al.,    )
                                 )
 5        Plaintiffs,            )
                                 )
 6   vs.               ) NO. MJG-02-CV-788
                                 )
 7   NEIL PADGETT, M.D., et al., )
                                 )
 8        Defendants.            )
 9
10        Deposition of DAN J. FINTEL, M.D., taken
11   before CHERYL F. GILMAN, C.S.R. and Notary Public,
12   pursuant to the Federal Rules of Civil Procedure for
13   the United States District Courts pertaining to the
14   taking of depositions, at Northwestern Memorial
15   Hospital, 201 East Huron Street, Conference Room B,
16   Chicago, Illinois, commencing at 5:55 o'clock p.m.
17   On the 29th day of September, A.D. 2003.
```

---

**Page 2**

```
 1        There were present at the taking of this
 2   deposition the following counsel:
 3        MS. DIANE M. LITTLEPAGE
          1406B Crain Highway
 4        Suite 207
          Glen Burnie, Maryland 21061
 5        (410) 787-7009
             on behalf of the Plaintiffs;
 6        ANDERSON, COE & KING by
 7        MS. LYNNE B. MALONE
          201 North Charles Street
 8        Suite 2000
          Baltimore, Maryland 21201-4102
 9        (410) 752-1630
10
             on behalf of the Defendant,
11        Neil Padgett, M.D.;
12        WILSON, ELSER, MOSKOWITZ, EDELMAN &
          DICKER, LLP by
13        MS. SHADONNA E. HALE
          1341 G Street, N.W.
14        The Colorado Building - Suite 500
          Washington, D.C. 20005
15        (410) 962-7023
16           on behalf of the Defendants,
             Dr. Ronan and Cardiovascular
17           Associates;
18        WHARTON, LEVIN, EHRMANTRAUT & KLEIN by
          MR. DOUGLAS K. SCHRADER (via telephone)
19        104 West Street
          P.O. Box 551
20        Annapolis, Maryland 21404-0551
          (410) 263-5900
21
             on behalf of the Defendants,
22        Marc Okun, M.D. and Kamal Batcha, M.D.
```

---

**Page 3**

```
 1             DEPOSITION OF
               DAN J. FINTEL, M.D.
 2
               September 29, 2003
 3
 4
 5   EXAMINATION BY              PAGE
 6   Ms. Malone              4, 141
 7   Ms. Hale                74, 147
 8   Mr. Schrader            117
 9
10             * * * * * * * * * * * *
11
12             E X H I B I T S
13   Dr. Fintel Deposition Exhibit No. 1     4
14   Dr. Fintel Deposition Exhibit No. 2     4
15   Dr. Fintel Deposition Exhibit No. 3    13
16   Dr. Fintel Deposition Exhibit No. 4    16
        (exhibit not attached)
17
```

ORIGINAL

EXHIBIT 4

---

**Page 4**

```
 1        (documents marked as requested,
 2        Dr. Fintel Deposition Exhibits
 3        No. 1 and 2)
 4
 5             DAN J. FINTEL, M.D.,
 6   called as a witness herein, having been first duly
 7   sworn, was examined upon oral interrogatories and
 8   testified as follows:
 9             EXAMINATION
10        by Ms. Malone:
11   Q    Now you can state your full name.
12   A    Dan J. Fintel. F-i-n-t-e-l.
13   Q    And your professional address?
14   A    Right here in this hospital center. And
15   that is Suite 10-240, 201 East Huron Street,
16   Chicago, Illinois 60611.
17   Q    What is your current position?
18   A    I'm an Associate Professor of Medicine at
19   Feinberg School of Medicine, Northwestern
20   University, and I'm Director of the Coronary Care
21   Unit on the 8th floor here of the hospital.
22        I have a number of other roles, but that
```

DEPOSITION OF DAN J. FINTEL, M.D.
CONDUCTED ON MONDAY, SEPTEMBER 29, 2003

5 (Pages 17 to 20)

---

17

1  according to this letter, you were sent a set of
2  records from Dr. Batcha, the deposition of
3  Mrs. Evans, and a report from Dr. Eugene Mark.
4  A  Yes.
5  Q  Now, other than the things that I just
6  listed and the things that are in -- listed in
7  Exhibit No. 3, do you have any other records that
8  you've reviewed?
9  A  Records? I don't think records. There
10 are some depositions of some of the treating
11 physicians that came earlier this year that are in
12 the large cavernous mass of my home, but in terms
13 of medical records, I brought everything that I
14 could find that I recall that I reviewed.
15 Q  Whose depositions did you read?
16 A  The depositions of the treating
17 physicians, although I went through them quite
18 rapidly so I don't have any notes of Drs. Padgett,
19 Okun, Ronan.
20 Q  Did you read the deposition of
21 Dr. Savard?
22 A  No. If it was sent to me, I didn't.

---

18

1      I get sent so much material, I don't
2  have time to go through all the minutiae of the
3  case, outside of the medical records, which is
4  where I do focus my attention upon.
5  Q  When did you begin preparation of the
6  report that we've marked as Exhibit 1?
7  A  My guess it would have been shortly after
8  I reviewed the materials. I usually dictate notes
9  to jog my memory. And then I would have sent it
10 to Miss Littlepage.
11 Q  So your routine would be to review the
12 medical records that were sent to you, and then to
13 make notes and then to generate a report and send
14 it off to Miss Littlepage?
15 A  Yes.
16 Q  Do you make your notes on paper, on
17 computer, do you dictate?
18 A  I usually dictate and somebody
19 transcribes them for me.
20 Q  Are those notes available?
21 A  Those are the notes.
22 Q  You mean Exhibit 1, your report?

---

19

1  A  Yes. There are no other notes.
2  Q  If we presume that the records came
3  sometime in March, April, 2001, do you have an
4  idea of when you completed this report, this
5  Exhibit 1?
6  A  It would have been 2001 or 2002.
7      Perhaps I had a discussion with
8  Miss Littlepage discussing some of these aspects.
9  Maybe there was some minor changes in it, but this
10 is what came off the word processor. Then I would
11 have edited it for grammatical errors and put it
12 on my letterhead electronically, and then e-mailed
13 it.
14 Q  Is there any way for us to figure out by
15 your billing records or any other records when you
16 actually wrote the report, or at least had close
17 to a final draft of the report, short of editing
18 work?
19 A  I didn't bring my bills. There's
20 probably only been two on this case. I would ask
21 Miss Littlepage to confirm that with me, but there
22 may have been one initially on my initial review

---

20

1  and one after we discussed it and maybe generated
2  the report. But as I sit here I really don't know
3  the time.
4      I will look at my computer tonight to
5  try to get that information for you if there are
6  any other bills.
7  Q  Did Miss Littlepage provide any
8  information -- editing information, if you will,
9  to add into the report?
10 A  I don't think in this case, no.
11 Sometimes there is a moderate amount of editing
12 that goes on, especially if an attorney comes up
13 with the report and I rewrite it. But this was
14 off of my word processor.
15     I remember an earlier version had a
16 bunch of errors, I saw on my computer. Just
17 grammatical errors. And I fixed them up.
18 Q  Do you consider this your complete and
19 final report on the review that you've done in
20 this case, of the record and the depositions?
21 A  It certainly doesn't contain all of my
22 thoughts. It's fairly short. And this deposition

---

DEPOSITION OF DAN J. FINTEL, M.D.
CONDUCTED ON MONDAY, SEPTEMBER 29, 2003

6 (Pages 21 to 24)

---

Page 21

will probably last more than an hour. But it's my only summary of my thoughts on the case.

Q   Who do you believe violated the standard of care in the care and treatment of Mr. Evans?

A   I believe that doctors involved in deviations from the standard of care were primarily the last two primary physicians who saw this individual, Dr. Padgett and Dr. Okun, who were responsible for managing his cardiovascular disease. And to some extent Dr. Ronan, to the extent that Dr. Ronan did not further evaluate Mr. Evans' symptoms of shortness of breath and chest pains, particularly with the letters of Dr. Batcha, which I received more recently, which indicated that Batcha was concerned -- we'll get into this. That pulmonary disease didn't explain all the symptoms, and that more cardiac testing needed to be done.

Q   What criticism do you have of the care rendered by Dr. Padgett?

A   Dr. Padgett was a family doctor who was trying to manage this patient, who had a number of

Page 22

complex and clearly interrelated medical problems. And particularly when Mr. Evans presented to Dr. Padgett's office in September, and finally October 3rd with progressive shortness of breath, weight gain after diuretics had been held off, and general ill-feeling, the addition of nitrate medications, particularly a dose of 0.6 milligrams of a Nitro-Dur patch, was inappropriate therapy, and led to a dramatic change in hemodynamics that led to the presentation of cardiogenic shock on 10-4, that ultimately proved fatal in the setting of his severe, undiagnosed, underlying coronary artery disease.

Q   So the way in which you believe Dr. Padgett violated the standard of care with regard to care and management of Mr. Evans was prescribing nitroglycerin for the patient on or around October 3rd?

A   That was one of my criticisms. And that was the final event that led to the disastrous events of October 4th.

But Dr. Padgett was part of a team of

Page 23

doctors managing a patient with known hypertrophic cardiomyopathy, multiple significant risk factors for coronary artery disease, who developed nuance of shortness of breath and some chest pain syndrome, variously described in his stomach or lungs, and who needed a significant augmentation or modification of therapy with diuretics. And as such, as part of that team, had a duty to the patient to fully evaluate the cause of this deterioration.

Now, Dr. Padgett had every right to defer to an expert in cardiovascular diseases during the North Arundel hospitalization in June of 2000 for the direction regarding cardiac evaluation, cardiac testing. But -- And thus I include Dr. Okun in my criticisms. But upon the return of Mr. Evans to Dr. Padgett's outpatient practice, the fact that the patient was still ill, still short of breath meant that this man had illness beyond the abilities of the typical general practitioner to be responsible for management and dosing changes.

Page 24

Q   I understand that you have a criticism with adding nitroglycerin to his medication regimen.

What I'd like for you to do is tell me the other way specifically in which Dr. Padgett malpracticed in his care and treatment of Mr. Evans.

A   Well, as I mentioned, besides the administration of nitroglycerin, the failure to promptly refer Mr. Evans back to the cardiologist, who at this time was Dr. Okun, it could have been Dr. Ronan who had been his cardiologist until the spring of 2000, for further care because the patient really was not well. Was still quite short of breath, still complaining of a number of symptoms, with an inconsistent response to the augmented medicine, such as the high dose proton pump inhibitor therapy and the increased diuretics, the patient was still quite short of breath and having abdominal chest pains.

Q   At what point in time should he promptly have referred the patient back for further cardiac

DEPOSITION OF DAN J. FINTEL, M.D.
CONDUCTED ON MONDAY, SEPTEMBER 29, 2003

20 (Pages 77 to 80)

Page 77

1  the chart I saw some description of the symptom
2  here.
3      Let me look at the words.
4      But severe is not present here. You
5  properly corrected me. I'll just read into the
6  record.
7      "In the past week he's developed a
8  retrosternal burning pressure-like discomfort when
9  he's supine at night." It goes through some tests
10 that were done, but does not use the word severe.
11  Q  Where in this note did you -- is the
12 basis for your opinion that he suggested
13 aggressive cardiac work-up?
14  A  He raises the question of chest
15 discomfort of questionable etiology. In the last
16 sentence, "The patient is advised to contact his
17 cardiologist for further evaluation." And we know
18 that he did not call Dr. Ronan for further
19 evaluation at that time.
20  Q  We know the patient did not call,
21 correct?
22  A  As best as I can tell, because there is

Page 78

1  no record in Ronan's chart that he was contacted
2  by the patient.
3   Q  Can we also agree there is nothing in
4  Dr. Batcha's chart that would indicate that
5  Dr. Batcha was concerned enough to call Dr. Ronan,
6  is that correct?
7   A  That is correct. A call was not made.
8   Q  And in terms of utilizing the term
9  aggressive cardiac work-up, the term aggressive is
10 not used in Dr. Batcha's note, is that correct?
11  A  That is correct. That is what was in my
12 mind about the response -- the symptom, correct.
13 That was not the wording that was used.
14  Q  Okay. If Dr. Batcha was truly concerned
15 about a cardiac etiology, you would expect him to
16 call a cardiologist, would you not?
17  A  There are various ways --
18  MR. SCHRADER: Objection.
19  MS. HALE: Let me rephrase the question.
20  Q  If you thought that a doctor was
21 very concerned about an acute cardiac process
22 going on, such as retrosternal discomfort and

Page 79

1  whether that could be related to coronary artery
2  disease in an acute process, you would expect a
3  physician to call a cardiologist, would you not?
4   MR. SCHRADER: Objection.
5   A  Some doctors pick up the phone and call,
6  others send faxes, others send letters. But with
7  extreme concern, there should be a phone call.
8  But not all doctors avail themselves of that.
9   MS. HALE: Q  But if you think there is an
10 acute process, you don't wait to dictate, have a
11 letter be typed and then sent through the regular
12 mail, is that correct?
13  A  That is correct.
14  MR. SCHRADER: Objection.
15  MS. HALE: Q  Have there been any other
16 materials that you have asked for that you've not
17 been provided in this case?
18  A  I don't believe so.
19  Q  And have you been provided any verbal
20 information, beyond what has been indicated in the
21 records and in the testimony that you've reviewed?
22  A  No.

Page 80

1      In fact my first meeting with
2  Miss Littlepage was today, and we hadn't spoken
3  about the case in more than a year or maybe
4  earlier this year briefly.
5   Q  And what information, if any, did she
6  provide you during your meeting?
7   A  Very little.
8   Q  Did you --
9   A  We just reviewed my opinions on the case,
10 and what I felt about the individual physicians.
11  Q  When did you develop the opinion that
12 Dr. Ronan had breached the standard of care?
13  A  I developed a general opinion sometime
14 last year that this patient had a problem that
15 required diagnosis early in the year 2000.
16     And without specifically mentioning
17 Dr. Ronan, because he was not in my initial
18 report, I was concerned that the managing
19 physicians were not adequately responsive to his
20 new symptoms, did not do -- primarily against the
21 cardiologist, did not perform some form of
22 evaluation for coronary artery disease.

Page 81

1  And to the extent that Dr. Ronan was one
2  of the doctors responsible for his care, he's
3  involved in that global criticism.
4  My primary criticism is against the last
5  two doctors who saw this patient.
6  Q  I understand that.
7  If I could summarize, is it true that
8  your testimony that Dr. Ronan breached the
9  standard of care would only be in relation to his
10 response to Dr. Batcha's letter or his office note
11 dated March 23rd, 2000?
12 A  Yes.
13 Q  Okay. And the purpose of Mr. Evans
14 seeing Dr. Batcha in March, 2000 was in relation
15 to his elbow surgery, is that correct?
16 A  As a clearance for pre-operative for
17 elbow surgery, correct.
18 Q  If there had been concern that Mr. Evans
19 had had coronary artery disease and whether that
20 was a risk for the elbow surgery, is it true
21 Mr. Evans did not suffer any cardiac related
22 complication from his elbow surgery?

Page 82

1  A  We don't know that. I do not have the
2  records of the elbow surgery. I know from the
3  postmortem there are signs of recent and older
4  heart attacks. It's possible, but I don't have
5  enough information as I sit here to make that
6  opinion.
7  Q  Would you be qualified to review
8  pathology slides or would you defer to a
9  pathologist on that issue?
10 A  I would defer.
11 Q  In the final emergency room when
12 Mr. Evans died, did you review the EKG or the
13 telemetry strips in order to interpret whether or
14 not he actually had a bundle branch block or
15 atrial fibrillation or would either of those be
16 significant to your opinions in the case?
17 A  I recall I saw an EKG that had a very
18 similar morphology, that is the intraventricular
19 conduction delay and repolarization abnormalities
20 that Mr. Evans had for the last few years of his
21 life.
22 Let me get back to the EKG before the

Page 83

1  pacemaker and the cardiac arrest.
2  This does show some change with a
3  disorganized atrial mechanism. As I looked
4  through this before, I could not rule out
5  atrial -- slow sinus rhythm, sinus bradycardia,
6  with atrial ventricular dissociation. And the
7  same kind of non-specific intraventricular
8  conduction delay that he'd had in the past.
9  Q  Would you agree that all of his EKGs were
10 consistent with hypertrophic cardiomyopathy?
11 A  They were all abnormal. They all
12 demonstrated an intraventricular conduction delay,
13 but not of a left bundle branch pattern. They did
14 show increased ventricular forces compatible with
15 ventricular hypertrophy and the possibility of a
16 previous inferior infarction.
17 We know that the EKGs in patients with
18 hypertrophic cardiomyopathy are quite abnormal
19 because of the increased muscle mass in the
20 altered depolarization. But in previous EKGs he
21 had clearly discernible P wave prior to each QRS,
22 meaning some form of ordinary -- normal

Page 84

1  atrioventricular conduction.
2  The EKG that was present in the
3  emergency room when he came in quite ill showed
4  atrioventricular dissociation or afib. I just
5  can't make out the fine baseline. But I think
6  there is some P waves buried within the complexes.
7  But he lost his normal sinus rhythm. Which is so
8  important for a patient with hypertrophic
9  cardiomyopathy.
10 Q  Okay. With the afib should he have
11 been --
12 MS. LITTLEPAGE: Defibrillated.
13 MS. HALE: Q -- defibrillated?
14 A  That would have been one of the options
15 available to the doctors if he was hypotensive.
16 Q  Did you have any complaint whatsoever
17 regarding the care and treatment that Mr. Evans
18 received in the emergency room?
19 A  Absolutely not.
20 Q  On October 4th?
21 A  No.
22 Q  Why was he not resuscitatable?

DEPOSITION OF DAN J. FINTEL, M.D.
CONDUCTED ON MONDAY, SEPTEMBER 29, 2003

23 (Pages 89 to 92)

---

Page 89

1  Q  Right. But if he did not have coronary
2  artery disease, would it more likely than not,
3  that he still would have died had he been given
4  the Nitrodur?
5  A  I don't know.
6  Q  Okay.
7  A  It's possible. I don't know.
8  Q  All right.
9  A  I said earlier that the chance of a fatal
10  reaction was much less if he did not the severe
11  underlying coronary disease.
12  Q  I want to make sure I understand your
13  testimony.
14      Was it that you had treated ten patients
15  over the last eighteen years with hypertrophic
16  cardiomyopathy?
17  A  Yes.
18      And several more have come into my CCU,
19  for which I was not the primary doctor. I might
20  have covered them for another doctor.
21  Q  Of those ten patients, were those
22  patients that you have continued to care for or

Page 90

1  were they isolated events?
2  A  Most. Some moved on to different
3  locations, some I continued to see.
4      In some cases I was a consultant for
5  number one kid from downstate who was brought in
6  by his mother, and I gave suggestions to the local
7  cardiologist in downstate Illinois. I did not
8  follow up on this individual.
9  Q  All right. And so to your knowledge,
10  have any of them died of sudden death?
11  A  One woman did.
12  Q  Was she under your care when she died?
13  A  I think I was working with my partner,
14  although I shared in the treatment, and she did
15  expire at some point several years after I met
16  her, when he was seeing her, but we were covering
17  for one another.
18  Q  Again, just to beat a dead horse here,
19  you had reviewed all the medical records at the
20  time that you issued your report, and this is the
21  only report that you have ever issued, and that's
22  been marked as Exhibit No. 1, right?

Page 91

1  A  I hadn't reviewed the report which is
2  obviously quite recent of Dr. Mark, the
3  pathologist at Harvard. This is dated May 1,
4  2003. There is no way I would have seen this when
5  I wrote my original report.
6  Q  I understand that.
7  A  I think also the records of Dr. Batcha,
8  with the deposition of Evans, were sent to me
9  about three months ago. And I would not have seen
10  those records. I would have seen some of those
11  notes in the letters written to Dr. -- or the
12  copies in Dr. Ronan's chart.
13  Q  Would you agree that you never saw any
14  evidence of chest burning in Dr. Ronan's records?
15  A  Correct, I did not.
16  Q  And you never saw any mention of chest
17  pain with exertion prior to March, 2000, is that
18  correct?
19  A  That is correct, I did not.
20      There was some work-up by
21  Dr. Young-Hyman back in '94 with a Persantine
22  stress test, nuclear study, which was stated to be

Page 92

1  normal.
2      So somebody was concerned about some
3  symptoms then, but they're not described in the
4  chart after that, other than the symptoms ascribed
5  to his GERD.
6  Q  Okay. Did Miss Littlepage go over prior
7  to the deposition the March, 2000 note of
8  Dr. Batcha that was cc'd to Dr. Ronan?
9  A  She did call that to my attention today.
10      I had read it. It was in my memory.
11  But she called attention to that.
12  Q  Okay. When you said that patients with
13  hypertrophic cardiomyopathy can have ischemia
14  without coronary artery disease, how is that
15  exhibited or manifested?
16  A  The significant thickening or hypertrophy
17  of the left ventricular mass is associated with an
18  insufficient blood supply to the most --
19  inner-most layers of the heart muscles in patients
20  with myocardial hypertrophy. There is data in the
21  literature that even in the absence of blockages
22  of the large arteries that pass on the outside of

93

1  the heart, what we call the epicardial coronary
2  arteries, patients with ventricular hypertrophy
3  can still develop sub-endocardial ischemia.
4      It's thought to be the source of
5  arrhythmias, increased chance for sudden death.
6  I've lectured on the subject. And it's certainly
7  a very common problem in managing patients with
8  significant hypertensive heart disease.
9    Q  But the ischemia that is evident in
10 hypertrophic cardiomyopathy is not something that
11 is an coronary artery by-pass graph or a stent or
12 an angioplasty would repair, is that correct?
13   A  Correct, it would not.
14   Q  But the ischemia caused by hypertrophic
15 cardiomyopathy can cause chest pain, correct?
16   A  Correct.
17   Q  Now, the ischemia that can be caused by
18 hypertrophic cardiomyopathy can lead to infarcts
19 within the heart, is that correct?
20   A  It may.
21   Q  And so therefore the infarcts that were
22 evident on the autopsy all aren't consistent with

94

1  hypertrophic cardiomyopathy, is that correct?
2    A  They all -- They may be consistent. That
3  is what you meant to say.
4    Q  Yes. Thank you.
5       Do you know of Dr. Mark?
6    A  He may have been one of my professors, I
7  believe, in my pathology class, if I recall him.
8  I believe I remember him when I was at Harvard
9  Medical School a long time ago.
10   Q  Do you know how Miss Littlepage -- I
11 don't want to stop you.
12      Do you know how she got your name to
13 review the case?
14   A  No idea.
15   Q  Did you recommended any other experts in
16 the case?
17   A  I don't think so.
18   Q  Do you know Dr. Friedlander in New York?
19   A  I don't think so.  No.
20   Q  And do you know Dr. Steven Achuff?
21   A  Yes, very well.
22   Q  Do you respect his opinions?

95

1    A  Yes, I do.
2    Q  Do you --
3    A  We may still disagree, but I respect his
4  opinions.
5    Q  Do you agree he's an expert in evaluating
6  patients in cardiology and in patients who may
7  present with symptoms of coronary artery disease?
8    A  Yes.
9    Q  Have you heard or do you know Dr. Bruce
10 Waller from Indianapolis?
11   A  Yes.
12   Q  Do you also respect his opinions?
13   A  Yes, I do.
14   Q  Is he also an expert in cardiology and in
15 cardiac pathology?
16   A  Yes, he is.
17   Q  Did Dr. Achuff and -- Do you believe
18 Dr. Achuff and Dr. Waller to be reasonable
19 practitioners?
20   A  Yes.
21      Dr. Achuff is one of my teachers when I
22 was a fellow at Hopkins.

96

1    Q  Have you reviewed their reports in this
2  case?
3    A  No, I have not.
4    Q  Would it surprise you to learn that both
5  of them are expected to testify that Dr. Ronan met
6  the standard of care?
7    A  It would not surprise me.
8    Q  And why is that?
9    A  Because depending on the information
10 available to Dr. Ronan, if he were unaware of the
11 deterioration of this patient, then he met the
12 standard of care.
13      It depends on what he knew about the
14 change and symptoms that this individual had, and
15 to what extent they could have been due to
16 coronary disease.
17   Q  Let me just make sure that I understand
18 then exactly what breach in the standard of care
19 that you're going to be testifying that Dr. Ronan
20 did.
21   A  It would depend on what information he
22 had available to him regarding the change in the