# Patuxent
# Medical
# Group .

Paummt Medical **amp,** Inc.
Deparcmenc of Cardiology
M~bael H, lde1emea, M.D.

**Two Knoll North Drive**
Columbia, Ma~y~and 21045
Tr1410-9G4-$303
l== 410•564-5329

March 22, 2004

Re: **Robert Evans**
**Supplemental Report**

**To Whom it May Concern:**

Mr. **Evans presented to Dr. padgettfs office** on, **the morning of**
**October 4, 2000.    At the time of presentation, he was mildly**
**hypotensive, he was in'distress, his electrocardiogram** revealed
a rhythm that appeared to be *AV dissociation or atrial*
**fibrillation.    He was then transported to the hospital, where he**
**had** a **progressive downhill course throughout the day.**    While *in*
the Emergency Room, **his cardiac rhythm was again noted to be**
**atrial fibrillation, although at times the rhythm appeared to an**
**AV dissociated rhythm.    His cardiac enzymes in the Emergency**
**Room were negative for a myocardial** *infarction.*

**Subsequent autopsy did reveal subendocardial infarction, which** S
**believe was caused by the arrhythmia and the** hypotension **and**
**progressive shook noted throughout** that **day.    There was no**
**evidence of a large area of acute infarction. His autopsy also**
revealed marked **hypertrophy of the left ventricle, and diffuse**
**fibrosis, consistent with his** history of hypertrophic
**cardiomyopathy.    I believe the cause of his death was the**
arrhythmia which **set in motion a shock like state.    Atrial**
arrhythmias are known **to be extremely devastating to patients**
**with hypertrophic cardiomyopathy.**

**The patient did have extensive coronary artery disease. He had**
**both epicardial disease and he also had small vessel disease,**
**and the latter is consistent with his diagnosis of hypertrophic**
**cardiomyopathy.    Had the patient been considered for coronary**
**bypass surgery, my belief is the outcome would** have **been poor.**
**Diabetics are** known **to have significantly worse outlook after**
**coronary bypass surgery, and the small** vessel **disease noted on**
**autopsy and part of his clinical diagnosis of hypertrophic**
**cardiomyopathy would have made effectiveness of coronary bypass**
**surgery questionable.    in addition, his progressive congestive**
**heart failure caused by his** hypertrophid **cardiomyopathy made his**

**EXHIBIT**

Page   - 2
Letter - RVANS,ROHERT


outlook poor.   I believe his survival, even had he survived
coronary bypass surgery, would have still been markedly reduced
and certainly less than five years.




MICHAEIN H. KETEMEN, M.D.
MHK/an  Ds 03/22/2004  T: 03/22/04

MASSACHUSETTS
GENERAL HOSPITAL

HARVARD
MEDICAL SCHOOL

Department of Pathology
55 Fruit Street, Warren 244
Boston, Massachusetts 02114-2696
Tel: 617.726.8891, Fax: 617.726.5915

Eugene J. Mark, M.D.
*Pathologist*
*Associah' Professor; Harvard Medical School*
*Director of Autopsy Stᴏᴛ ice*
*Delnrhl Medical Exrartitu•r*

Your # A-00-11,
        North Arundel Hospital,
        Glen Burnie, Maryland

Patient:  Evans, Robert

My # GM 8308

1 May 2003

Diane M. Littlepage, P.A.
Crain Professional Building
1406 B South Crain Highway, Suite 207
Glen Burnie, Maryland 21061

Diagnosis: Heart, autopsy:  1. Cardiac hypertrophy, biventricular, marked.

2. (Diabetes mellitus), with microvascular arteriosclerosis.

3. Coronary arherosclerosis, marked.

4. Myocardial infarction, old (months-years), subacute (few weeks),
    and acute (twelve to twenty-four hours and ongoing).

5. Myocytolysis.

Dear Madam:

       I have reviewed microscopically thirteen glass slides, which represent histological preparations of heart examined at autopsy. The slides have been stained with hematoxylin and eosin. The left ventricular free wall measures up to twenty millimeters in thickness on the slides. I have reviewed the report of autopsy, which was performed on 5 October 2000 at North Arundel Hospital, Glen Burnie, Maryland by Ferdinand C. Rodriguez, M.D.

       Histopathologically, the myocardium contains generalized myocyte hypertrophy with large cells having large nuclei, which are variable in size with increased chromatin.

       Histopathologically, intramyocardial arteries and arterioles have intimal thickening and narrowing of lumens. This constitutes coronary arteriosclerosis of small blood vessels and characterizes the vascular pathology that is seen in diabetes mellitus among other conditions.

**EXHIBIT**

Page 2
GM 8308

Macroscopically, the heart at autopsy weighed 900 grams, which is between two and three times normal weight. The left ventricular wall measured twenty-two millimeters in thickness, which is increased. The right ventricular free wall measured six millimeters, which is increased. .

Macroscopically, the coronary arteries had marked atherosclerosis of the right and left coronary arteries. There was up to 100 percent occlusion of the right coronary artery and 95 to 98 percent occlusion of the left coronary artery. The occlusion was caused atheromatous plaque. Histological sections of these coronary arteries are not available for review.

Histopathologically, large areas of the myocardium have old established scarring with broad bundles of collagen and ectatic blood vessels. These scars are in part focal and in part dispersed as old interstitial fibrosis amidst cardiac myocytes. This constitutes old myocardial infarction, which is months or years in age.

Histopathologically, a few regions of myocardium (slides 20 and 32) show foci with myxoid fibrosis and fibroblastic proliferation and drop-out of myocytes. This constitutes myocardial infarction, which is a few weeks in age.

Histopathologically, several regions show acute eosinophilic necrosis of myocytes with loss of nuclei and loss of cross-striations. There is edema in these regions. A few collections of neutrophils are present. This constitutes acute myocardial infarction of approximately twelve to twenty-four hours in age. In some areas of acute infarction is fresh interstitial and subendocardial hemorrhage. This also indicates acute necrosis. The acute myocardial infarction lies in areas with older and old myocardial scarring. This corresponds to the mottling of dark gray and red areas observed macroscopically.

Histopathologically, extensive regions of subendocardial myocardium show myocytolysis. This is a nonspecific finding. It is seen with ischemia as well as with diabetes mellitus, metabolic conditions, electrolyte disturbances, and other conditions.

Macroscopically, the lungs weighed 2600 grams and appeared edematous. This is approximately three to four times normal weight. The elevated weight is consistent with pulmonary edema. Slides of the lungs and slides of other organs are not available for review.

I have reviewed approximately three hundred pages of medical records and reports. These come principally from North Arundel Hospital, Glen Bumie, Maryland; Maryland Pulmonary and Critical Care Group, Glen Bumie, Maryland; and reports from doctors' offices.

Clinically, the patient came to the hospital emergency room in 2000 when he was forty-seven years old. He had a medical history of hypertrophic cardiomyopathy, diabetes mellitus, gastroesophageal reflux, hypertension, obesity and arthritis. He had had episodes of congestive heart failure.

Page 3
GM 8308

On the day of death, the patient put a nitroglycerin patch on about 6:00 A. M. and took it off about 9:00 A. M. An electrocardiogram in the emergency department at 1:30 P. M. was interpreted as showing showed possible atrial fibrillation. The patient had a systolic blood pressure, of 103 millimeters of mercury after administration of 700 cubic centimeters of fluid. The patient denied chest pain, abdominal pain and headache. The patient had abdominal discomfort at 1:40 P.M. and said that he thought it was from vomiting that had started approximately one hour previously.

The patient became progressively more ill and had a cardiac arrest. He was initially successfully resuscitated. The patient died at 3:44 P. M. of the same day according to the Certificate of Death in the State of Maryland. The cause of death was pulmonary edema of minutes/hours duration due to severe acidosis of minutes/hours duration due to hypotension of minutes/hours duration due to hypertrophic cardiomyopathy of years duration according to the Certificate of Death.

Cardiac hypertrophy makes the myocardium more susceptible to ischemia from large and from small blood vessel disease, because there is more tissue to perfuse from less vascular supply. Acute myocardial infarction often occurs in regions that have sustained older or old myocardial infarction, because the same areas liable to ischemia in the past are again liable to ischemia in the present.

I conclude that the patient had cardiac disease due to three different causes: hypertrophic cardiomyopathy, diabetes mellitus, and coronary atherosclerosis. The three diseases may be interrelated in some patients and are interrelated in this pateint. I conclude that he sustained myocardial infarctions of varying ages, beginning months or years previously, continuing to a few weeks prior to death, and continuing further on the day of death. The most recent myocardial infarction occurred approximately at the time that he reportedly applied the nitroglycerin patch. I conclude that the cardiac disease with myocardial infarctions of varying ages caused death.

The pathological materials are hereby returned and the majority of the medical records are hereby returned. Please return the slides when you have completed your need for them, so that they can become part of our permanent collection in pathology for teaching and research. If questions arise in the future about the findings on the glass slides beyond the contents of this report, I would like the opportunity to review the glass slides again at that time.

Sincerely yours,

A$^{k}_{ta}$

Eugene J. Mark, M.D.

MASSACHUSETTS
GENERAL HOSPITAL

HARVARD
MEDICAL SCHOOL

Department of Pathology
55 Fruit Street, Warren 244
Boston, Massachusetts 02114-2696
Tel: 617.726.8891, Fax: 617.726.5915

Eugene J. Mark, M.D.
*Patholgtirist*
*Associate Professor, Harvard Xledical School*
*Director of Autopsy Service*
*Deputy Medical Eraminer*


Your # A-00-11.
        North Arundel Hospital,
        Glen Burnie, Maryland

Patient:  Evans, Robert

My # GM 8308 ADD                                        14 August 2003


Diane M. Littlepage, P.A.
Crain Professional Building
1406 B. South Crain Highway, Suite 207
Glen Burnie, Maryland 21061


Diagnosis:      Coronary arteries, autopsy: Atherosclerosis. old and evolving, marked, in regions occlusive.

                Lung, autopsy: Pulmonary edema and congestion.

                Liver, autopsy: Acute centrizonal congestion and slight early centrizonal necrosis and steatosis.

                Spleen, autopsy: Acute congestion.


Dear Madam:

    I have reviewed microscopically an additional approximately forty glass slides, which represent histological preparations of organs apart from the heart examined at autopsy. I have previously examined the macroscopic and microscopic pathology of the heart, and those observations and conclusions are described in my report of 1 May 2003.

    Four slides represent coronary arteries. Histopathologically, the arteries show marked atherosclerosis, which includes old collagenized sclerosis of media and intima as well as an inflammatory response including lipid-containing histiocytes and lymphocyes and hemosiderin-laden macrophages. Microfocal calcification is present. One slide has fibrin beneath the endothelial surface of a plaque. Another slide has disrupted plaque with cholesterol clefts. The lumen is occluded in some cuts of the artery, and venules are the only vascular spaces in the atherosclerosis in these sections. These changes represent atherosclerosis in various stages from chronic to subacute to unstable.

    Histopathologically, the lungs have many regions where alveoli are filled with eosinophilic fluid. The pulmonary capillaries and veins are congested. Macroscopically the lungs weighed 2600 grams and appeared edematous. This constitutes pulmonary edema. The lungs show no venous sclerosis or interstitial fibrosis.

Page 2
GM 8308 ADD

Histopathologically, the liver shows centrizonal congestion with widening of the sinuses. There is moderate steatosis. Some hepatocytes in the centrizonal region are pyknotic. Macroscopically the liver weighed 2900 grams and appeared dark reddish-brown. This constitutes acute hepatic congestion -and steatosis. The liver shows no centrizonal fibrosis or hemosiderin.

Histopathologically, the spleen is congested.

Histopathologically, the gastrointestinal tract and pancreas and kidney show autolytic changes and otherwise no significant abnormalities.

Histopathologically, the thyroid gland and adrenal gland and other tissues show no significant abnormalities. The prostate gland and testis and epididynmis are unremarkable.

I conclude that the pulmonary edema and the acute centrizonal hepatic congestion and the acute splenic congestion are a result of acute cardiac failure, which was due to the. previously described acute myocardial infarction. These conclusions are made with reasonable medical certainty.

Prior observations and conclusions are unchanged.

The pathological materials are hereby returned.

Sincerely yours,

Eugene J. Mark, M. D.

DEPOSITION OF EUGENE J. MARK, M.D.
CONDUCTED ON WEDNESDAY, OCTOBER 29, 2003

1 (Pages 1 to 4)

1            VOLUME: I
2            PAGES: 1-139
3            EXHIBITS: 1-18
4
5      UNITED STATES DISTRICT COURT
6      FOR THE DISTRICT OF MARYLAND
7    ------------------x
8    JUDITH A. EVANS, et al.,
9            Plaintiffs,
10    v.            **Civil** Action
11    NEIL PADGETT, M.D., et al.,      No. MJG-02-CV-788
12            Defendants.
13    ------------------x
14
15      DEPOSITION of EUGENE J. MAR   , M.D.
16      Wednesday, October 29, 2003
17            5:52 p.m.
18         Holiday Inn Select
19          5 Blossom Street
20         Boston, Massachusetts
21
22
23
24    Reporter: Michael D. O'Connor, RPR

1    Via Telephone:
2
3    ANDERSON, COE & KING
4    By J. Michael Slonekar, Esquire
5    201 N. Charles Street, Suite 2000
6    Baltimore, Maryland 21201-4102
7    (410)752-1630
8    For Neil Padgett, M.D. and Mary and Primary
9      Physicians.
10
11    WHARTON, LEVIN, EHRMA  TRAUT & KLEIN
12    By Douglas K. Schrader, Esquire
13    104 West Street
14    Annapolis, Maryland 21404-0551
15    (410)263-5900
16    For Kamal Batcha, M.D. and Ma c Okun, M.D.
17
18
19
20
21
22
23
24

2

1   **APPEARANCES:**
2
3   **DIANE M. LITTLEPAGE, P.A.**
4   **By Diane M. Littlepage, Esquire**
5   **1406-B S. Crain Highway, Suite 207**
6   **Glen Burnie, Maryland 21061**
       **`))787-7009**
       **the Plaintiff.**

   **SON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**
   **3hadonna E. Hale, Esquire**
   **East Pratt Street, Suite 430**
   **timore, Maryland 21202**
   **))962-7023**
   **Dr. James Ronan and Cardiovascular**
   **;sociates, P.A.**

1            **I N D E X**
2    Deposition of            irect  Cross
3    EUGENE J. MARK, M.D.
4      By Ms. Littlepage        6
5
6            **EXHIBITS**
7    No.                    Page
8    1  Notice of Taking Deposition
9    2  Letter to Eugene J. Mark, M.D. from
10     Shadonna E. Hale, dated 8/29/03        6
11    3  Letter to Counsel from Diane M.
12     Littlepage, dated 5/29/03
13    4  Letter to Eugene Mark, M.D. from
14     Kimberly Pierson, dated 8/22/03        6
15    5  Document entitled, "Cardiovascular
16     Pathology"            6
17    6  Document entitled, "Atlas of Cardiovascular
18     Pathology"            6
19    7  Letter to Diane M. Littlepage from Eugene
20     J. Mark, M.D., dated 5/l/03        6
21    8  Letter to Diane M. Littlepage from Eugene
22     J. Mark, M.D., dated 8/14/03        6
23    9  Document entitled, "Diagnostic Surgical
24     Pathology"            6

Case 1:02-cv-00788-MJG    Document 83-2    Filed 04/21/2004    Page 9 of 23
DEPOSITION OF EUGENE J. MARK, M.D.
CONDUCTED ON WEDNESDAY, OCTOBER 29, 2003

5 (Pages 17 to 20)

17

1  issues were addressed in my article in 1995, I don't
2  know from memory.
3       Q.  Can you just circle the articles rather
4  than reading them. That may save a little time. Do
5  you have a pen?
6       A.  Do you want me to start over?
7       Q.  No.
8       MR. SLONEKAR: While the doctor is doing
9  that, may I ask Ms. Littlepage if she could
10 summarize the scope of Dr. Mark's testimony?
11      MS. LITTLEPAGE: He will be testifying as
12 to his reports. He will be reviewing the slides,
13 including the pathology of the slides, and any
14 opinions as to the location of the coronary arteries
15 and the amount of stenosis on the slides and whether
16 it's old or new plaque. He will be talking about
17 the timing of the findings of the necrosis of the
18 heart.
19      He does have some opinions regarding the
20 slides of the gastrointestinal tract, and he will
21 offering opinions as to how his findings relate to
22 the care and treatment that Mr. Evans received.
23      MR. SLONEKAR: You trailed off a little
24 bit, and I didn't hear the last part of what you

18

1  said.
2       MS. HALE: You said something about
3  relating to care and treatment.
4       MR. SLONEKAR: I'm actually yelling into
5  this phone. I didn't hear the end of what you said.
6       MS. LPTTLEPAGE: And how his findings
7  relate to the care and treatment that Mr. Evans
8  received.
9       MR. SLONEKAR: Is he going to give opinions
10 on life expectancy?
11      Q.  Are you going to give opinions regarding
12 life expectancy, Dr. Mark?
13      A.  If asked, I can.
14      Q.  Do you have an opinion that you're going to
15 testify to to a reasonable degree of medical
16 probability as to what Mr. Evans' life expectancy
17 was in 2000?
18      A.  To the best of my ability, yes.
19      MR. SLONEKAR: Where is that in his report?
20      MS. HALE: It's not.
21      MR. SLONEKAR: I know.
22      Q.  Are you giving opinions regarding standard
23 of care of any practitioner?
24      A.  If asked any question,-I will do so to the

19

1  best of my ability.
2       MR. SLONEKAR: In the proffer that Ms.
3  Littlepage just made, she didn't say anything about
4  standard of care or life expectancy. If the report
5  doesn't reflect any of that, I'm going to object.
6  We were not given any information that this
7  physician was going to have opinions on those areas.
8  If he is, then this deposition isn't going to be
9  completed tonight.
10      MS. LITTLEPAGE: Okay.
11      MR. SLONEKAR: We are entitled to advance
12 notice of what witnesses are going to testify to.
13      MS. LITTLEPAGE: Ask your questions,
14 Michael.
15      MR. SLONEKAR: Well, no. I want a proffer
16 right now. Are you going to use this witness to
17 give opinions about standard of care and life
18 expectancy and other areas that you've not addressed
19 in the 26(a)(2) statements that were filed?
20      MS. LITTLEPAGE: If asked questions
21 regarding his life expectancy, he will answer them.
22 He will testify as to the care and treatment that
23 Mr. Evans received and how it is related to his
24 findings, his pathological findings.

20

1       MR. SLONEKAR: My question is real simply,
2  yes or no. Are you going to at trial elicit
3  opinions from Dr. Mark on standard of care?
4       MS. LITTLEPAGE: He will be testifying as
5  to the relationship of the treatment that Mr. Evans
6  received from his health care providers and to his
7  pathological findings.
8       MR. SLONEKAR: What's the answer to my
9  question?
10      MS. LITTLEPAGE: If his pathological
11 findings relates to what he sees as a breach of the
12 standard of care by one of the health care
13 providers, he will be testifying to that.
14      MR. SLONEKAR: Well, you must know right
15 now whether you are going to ask him questions about
16 standard of care issues, and we are entitled to know
17 that, and we were entitled to know it back in May
18 when he issued a report.
19      Do you intend to elicit standard of care
20 testimony in front of the jury from this witness,
21 because if you're not, then we don't have to ask
22 questions about that?
23      MS. LITTLEPAGE: Mike, I have given you the
24 best answer that I can give you.

DEPOSITION OF EUGENE J. MARK, M.D.
CONDUCTED ON WEDNESDAY, OCTOBER 29, 2003

6 (Pages 21 to 24)

21

MR. SLONEKAR: Well, that's ridiculous.
Fine. I will file a motion with the judge asking
that Dr. Mark be excluded, because you're either
playing games -- you may get away with it in state
court, but you're not going to get away with it in
federal court. We were entitled, when the report
came out, on what the subject areas were going to be
of this guy's testimony, and what we got was his
review of the pathology slides.

If you intended to have him testify as to
life expectancy and standard of care and other
things not reflected in his report, then you were
obligated to let us know that a long time ago.

MS. LITTLEPAGE: Shadonna, do you want to
go into questioning?

MS. HALE: Sure.

Q. Would you agree, Dr. Mark, none of the
articles or presentations or materials described in
your CV are directly related to coronary artery
disease or hypertrophic cardiomyopathy?

A. No. You've asked that question three times
now, and I've answered it to the best of my ability.

Q. No. I changed the question, and that is
directly related.

22

A. Yes, some are directly related.

Q. Are there any case studies of a patient in
which the primary diagnosis was coronary artery
disease or hypertrophic cardiomyopathy?

A. Do you want me to go through them again?

Q. Well, I guess I have to.

A. That's fine, I can go through them again.

Q. Let me ask you this. Is it going to be
your testimony that all that you've circled are
directly related?

A. That question has been asked and answered.
To the best of my ability, they are all related to
an understanding of heart disease. Coronary artery
disease is a common heart disease; it's the most
common heart disease. To understand coronary artery
disease, you need to understand all other heart
diseases. To my mind, that's directly related.
Whether you like the answer or not, that's my
answer.

Q. Well, let me change -- I don't know how to
narrow the question more than I have. I understand
that what you have circled have to do with almost
any article that deals with heart disease, correct,
because that's important to understand coronary

24

artery disease?

A. That's incorrect. There are many of these
case records that talk about the heart, because the
heart is an important organ in many of these 280
cases. I've circled the ones that hone in on heart
disease as a salient issue in the differential
diagnosis, and I've also indicated earlier that
several of them specifically were myocardiopathies,
and that's a direct answer to your question. Yes,
those were having to do with cardiomyopathies of
which hypertensive cardiomyopathy is one.

If you want to know how many of these
patients have hypertension, you could go to the
library and look through all of 280 and see how many
patients had hypertension. I don't know.

Q. Do any of these cases deal with
hypertrophic cardiomyopathy and a diagnosis of that
condition?

A. That word doesn't appear, but these
patients do have hypertrophy of the heart, and by
many standards, that's hypertrophic cardiomyopathy.

Q. By what standards is hypertrophy of the
heart hypertrophic cardiomyopathy.

A. By the basic standard that the heart is too

24

big.

Q. Tell me what criteria is used to diagnose
hypertrophic cardiomyopathy?

A. Which type?

Q. Any type. How many types are there?

A. We could discuss them for the next hour at
least. If you want to take an hour off, that's what
we will have to do, and we can either address it
radiographically, physiologically or anatomically.
You have to give me some guidance in how you want to
proceed.

Q. What kind of hypertrophic cardiomyopathy
did Mr. Evans have?

A. The presume genetic form, with asymmetric
hypertrophic myocardiopathy with marked thickening
and marked increasingly.

Q. What is the criteria used to diagnose that
type of HCM?

A. There's no one criterion, but among those
are an elevated weight, an elevated ventricular free
wall, asymmetry, histologic findings, including
enlarged cells, enlarged nuclei, interstitial
fibrosis, disorganization of the fibers, at the
ultrastructure level abnormal myofilaments, abnormal

DEPOSITION OF EUGENE J. MARK, M.D.
CONDUCTED ON WEDNESDAY, OCTOBER 29, 2003

25 (Pages 97 to 100)

97

1  disease in coronary arteries?
2      A.  Where are you looking at that now?
3      Q.  I'm sorry, I thought you were on the next
4  page.
5      A.  No. Still on Paragraph 5. I would
6  disagree with the eighth from last line where the
7  suggestion is made that left ventricular wall motion
8  abnormalities equal coronary artery disease, because
9  they do not. One does not need ventricular wall
10  motion abnormalities to have coronary artery
11  disease, nor does coronary artery disease equal wall
12  motion abnormalities.
13      Q.  Wall motion abnormalities are seen when
14  there is a myocardial infarction; is that correct?
15      A.  Yes.
16      Q.  Wall motion abnormalities is something that
17  is seen on echocardiograms; is that true?
18      A.  That's the easiest way to detect them.
19      Q.  Well, wall motion abnormalities cannot be
20  seen after death, correct?
21      A.  No.
22      Q.  That's correct?
23      A. That's correct. I would disagree on Page 5
24  in the highlighted area where the statement is made

98

1  that "exercise stress testing had been performed and
2  the conclusion is it would have been normal because
3  a few months later there was severe disease in the
4  coronary arteries." The disease in the coronary
5  arteries is years old, and much of it, possibly most
6  of it, would have antedated the hypothetical time at
7  which the suggestion is made that stress testing
8  would have been normal.
9      Q.  Would you agree if there's equally severe
10  disease of the coronary arteries that may affect the
11  interpretation of a stress test or would you have to
12  defer to a cardiologist for that question.
13      A.  No, I wouldn't necessarily have to defer.
14      Q.  Then how is equally severe coronary
15  disease, how is that reflected in the stress test?
16      A.  I don't understand what equally severe
17  means, but severe coronary artery disease means that
18  blood is not going to the heart to the degree
19  optimal, and a patient under a stress test with a
20  markedly impaired coronary circulation will have SD
21  wave changes, chest pain or both or worse.
22      Q.  You do not interpret EKGs; is that correct?
23      A.  That's not correct.
24      Q.  You do interpret them?

99

1      A.  In my Army career I did.
2      Q.  Did you interpret any of the EKGs in the
3  records in this case?
4      A.  I looked at them, but I didn't give any
5  independent interpretation, and I have no criticism
6  of the interpretations.
7      Q.  So you would agree, then, that the
8  interpretations of the EKGs in this case are
9  consistent with the disease of HCM?
10      A.  With or without coronary artery disease.
11      Q.  You would agree with that?
12      A.  Yes. I would disagree with the statement
13  that the presence of a left bundle branch block is
14  not an indication of the presence of coronary artery
15  disease.  Most patients with left bundle branch
16  block have that disease due to coronary artery
17  disease.
18      Q.  What literature would I look at to find
19  that?
20      A.  You could look in Harrison's "Principles of
21  Internal Medicine."
22      Q.  Do you know what the percentage of patients
23  with HCM are that have left bundle branch block?
24      A. I don't, but what I do know is coronary

100

1  artery disease is so much more common than
2  hypertrophic cardiomyopathy, that the majority of
3  patients with that bundle branch block have disease
4  due to coronary artery disease with or without
5  hypertrophic cardiomyopathy.
6      Q.  What percentage of coronary artery disease
7  have left bundle branch block?
8      A. Small.
9      Q.  What percentage of patients with HCM have
10  left bundle branch block?
11      A.  It's higher, but I don't know the
12  percentage.
13      Q.  Okay.
14      A. I disagree with the statement in Paragraph
15  6, the last sentence, where it says, "Based on two
16  normal cardiac enzymes that most, if not all, of the
17  ventricular myocardial scarring was due to
18  hypertrophic cardiomyopathy." This is a striking
19  concept in a patient who has so severe coronary
20  artery disease that has occluded one artery
21  completely and the other to 98 percent.
22      I'm going to skip Paragraph 7, because it
23  has to do with standard of care.
24      Q.  Okay. Are you going to give an opinion to

DEPOSITION OF EUGENE J. MARK, M.D.
CONDUCTED ON WEDNESDAY, OCTOBER 29, 2003

26 (Pages 101 to 104)

101

1 a reasonable degree of medical probability regarding
2 Mr. Evans' life expectancy?
3    A.   If asked, I will do my best.
4    Q.   What is your opinion as to Mr. Evans' life
5 expectancy from the coronary artery disease if
6 treated in 2000?  Well, do you disagree with Dr.
7 Waller's life expectancy that he described?
8    A.   That's a different question from the prior
9 question.
10    Q.   I know.
11       MR. SLONEKAR: I didn't hear the answer to
12 the prior question.
13       MS. HALE: He didn't answer it, that's why
14 1 interrupted it.
15    Q.   You would agree that Mr. Evans' life
16 expectancy was substantially reduced from the HCM,
17 would you not?
18    A.   Yes.
19    Q.   And would you agree that this 25-year life
20 reduction from HCM is reasonable as opined by Dr.
21 Waller?
22    A.   No.
23    Q.   What is the life reduction, in your
24 opinion, to a reasonable degree of medical

102

1 probability based on the HCM?
2    A.   Mr. Waller at age 47, if he were otherwise
3 healthy, would have had a life expectancy such that
4 he might have been expected to live to about 75
5 years. To say that he had a 25-year life reduction
6 is to say that he's probably going to die in the
7 next three years, and I don't think that stands to
8 reason when the expected cause of sudden death in
9 these patients is three percent per year, in the
10 literature that I quoted, or even ten percent per
11 year in a question you asked me.
12    Q.   If it's at ten percent per year, what year
13 do you begin providing this opinion that there's
14 that percentage degree of life expectancy?
15    A.   That question doesn't make any sense to me.
16    Q.   Well, does it start at age one, meaning a
17 child has a three percent risk of death from HCM and
18 then each year it's three percent?
19    A.   No. It starts the year the diagnosis is
20 made or should have been made.
21    Q.   And what literature do you rely on for the
22 opinion that the risk of annual death begins at the
23 time of diagnosis?
24    A.   I rely on common sense in that regard.

103

1 Sometimes one has to rely on common sense,.
2    Q.   Okay-
3    A.   I understand the English language. It's my
4 native tongue.
5    Q.   So that's the only basis for your opinion,
6 then, that it begins at the time of diagnosis?
7    A.   I think that's the major basis. I always
8 rely and fall back on common sense.
9    Q.   I'm just asking you. I need to know the
10 bases for your opinion. Is there anything else?
11    A.   Yes, you're just asking me, but again,
12 you're being sarcastic in trying to suggest the risk
13 would occur as an infant. It's a rather infant tile
14 question. It's late, and I'd rather we get to
15 substantial questions and be prepared for
16 informative questions so we can get to the
17 informative answers, and I'm trying to speed it
18 along. I wish you were more prepared for this
19 deposition. In my opinion, you are not.
20    Q.   What was his life expectancy at 47 to a
21 reasonable degree of medical probability?
22       MS. LITTLEPAGE: Objection. He has already
23 answered that question.
24       MS. HALE: Let me change the question.

104

1    Q.   At what age was he diagnosed with
2 hypertrophic cardiomyopathy?
3    A.   From memory, I believe approximately 1994,
4 but I'd have to check the records to be sure on
5 that.
6    Q.   All right. Assuming for the purposes of
7 this question that he was diagnosed in 1994, what
8 was Mr. Evans' life expectancy as a result of his
9 HCM?
10       MS. LITTLEPAGE: Objection. Asked and
11 answered.
12    A.   His life expectancy was reduced several
13 years, but I don't believe it's logical to say, all
14 things considered, that it was reduced 25 years, and
15 I cannot be more precise.
16    Q.   So you cannot give an opinion to a
17 reasonable degree of medical probability as to what
18 Mr. Evans' life expectancy was; is that correct?
19    A.   No, that's not correct. That's not what I
20 stated. You misquoted me or misstated my words.
21    Q.   What is your opinion to a reasonable degree
22 of medical probability as to Mr. Evans' life
23 expectancy at any point in time due to his HCM`.?
24    A.   You've asked that, and I've answered it.

DEPOSITION OF EUGENE J. MARK, M.D.
CONDUCTED ON WEDNESDAY, OCTOBER 29, 2003

27 (Pages 105 to 108)

105

1  I've said that his life expectancy was decreased by
2  several years, but not to a 25-year reduction,
3  because it doesn't make sense based on the total
4  picture.
5      Q.   Was his life expectancy beyond the age of
6  60?
7      A.   I've answered it to the best of my
8  abilities.
9      Q.   All right. I just want to make sure you're
10 not going to come in at trial and give an age, then.
11     Do you have an opinion to a reasonable
12 degree of medical probability as to Mr. Evans' life
13 expectancy based on his coronary artery disease had
14 it been treated in the year 2000?
15     A.   My answer would be similar based on what we
16 know about the whole case. His life expectancy with
17 treatment would have been reduced several years, and
18 beyond that, one would have to see how effective the
19 initial treatment was.
20     Q.   There has been testimony from the
21 Plaintiffs experts in this case that the life
22 expectancy was ten years. Do you disagree with
23 that?
24         MS. LITTLEPAGE: Objection.

106

1      A.   I've given the best answer I can. It would
2  have been decreased by several years.
3      Q.   To what degree did Mr. Evans' diabetes
4  reduce his life expectancy?
5      A.   A few years.
6      Q.   To what degree did Mr. Evans' hypertension
7  reduce his life expectancy?
8      A.   As an independent factor and know it's
9  already incorporated into his coronary artery
10 disease.
11     Q.   Can there be other organ damage other than
12 coronary artery disease when one has hypertension?
13     A.   Yes.
14     Q.   Such as kidney disease?
15     A.   Yes.
16     Q.   So you would agree that his hypertension
17 could affect other organ systems which would
18 potentially reduce his life expectancy; is that
19 correct?
20         MS. LITTLEPAGE: Objection.
21     A.   Potentially it could, but we had the
22 kidneys to examine at autopsy and they did not have
23 hypertensive disease.
24     Q.   Dr. Mark, referring you back to the slides

107

1  again, what slides are you going to utilize to
2  explain to the jury the extent of coronary artery
3  disease present in Mr. Evans?
4      A.   I'm going to utilize, if asked, the four
5  slides that we earlier described, LC, LC, RC and RC.
6      Q.   Are you going to be using any of the other
7  slides?
8      A.   I don't intend to.
9      Q.   Can you find the other slides which you
10 said describe some of the blood supply in the other
11 vessels in the heart?
12     A.   I could if I had a microscope, but I can't
13 do that without a microscope.
14     Q.   You cannot do it with the magnifying glass
15 that you brought?
16     A.   I can try. I suspect not, but I would be
17 happy to try.
18     Q.   Doctor, can I ask you why we were not able
19 to do the deposition in your office?
20     A.   It's too small.
21     Q.   Is there anyplace at Harvard that you
22 utilize when residents are observing slides with
23 you?
24     A.   Yes.

108

1      Q.   Why could we not use that area?
2      A.   My office, and it's too small.
3      Q.   There's no conference room that has
4  microscopes for any kind of joint presentation or
5  learning session for residents?
6      A.   Yes.
7      Q.   And why could we not use that area?
8      A.   Because it's used for learning and
9  teaching, not for depositions.
10     Q.   Okay.
11     A.   I can't find the arteries with a hand lens.
12     Q.   Is that going to be something you can do
13 between now and your next deposition, look at the
14 actual slides, so that you would be prepared to
15 answer which slides you could utilize to discuss the
16 blood supply in the heart?
17     A.   Yes.
18     Q.   Okay. I would like to ask you to formally
19 do that, Dr. Mark, because we will be continuing
20 this by telephone.
21     A.   I don't want to take the slides tonight for
22 fear of them being misplaced.  What I would rather
23 do is give them to the Court or to one of you, and
24 then review them prior to that time, if you could

Case 1:02-cv-00788-MJG    Document 83-2    Filed 04/21/2004    Page 14 of 23
DEPOSITION OF EUGENE J. MARK, M.D.
CONDUCTED ON WEDNESDAY, OCTOBER 29, 2003

11 (Pages 41 to 44)

41

1  artery sections.  Right and left are important. If
2  you would like to proceed by misquoting me, the
3  deposition will take a long time and we will not
4  finish tonight.
5      Q.   That's up to you, Dr. Mark. I have a hotel
6  room. I'm not really concerned.
7      A.   Would you like to quit now, because I don't
8  like surly questioning, misquoting answers, and it's
9  up to you when this deposition can end. It's not
10 going to go beyond four hours. If you would like to
11 reschedule, that's fine, and we can do it right
12 tonight.
13     MR. SLONEKAR: For the record, there's been
14 no surly questioning. There has been answers that
15 have been intentionally evasive and misleading and
16 argumentative. But no questions have been surly.
17     A. I'm not sure how a person 1,000 miles away
18 can determine what is surly and what is not. Can
19 you explain that to me?
20     Q.   I will ask the question again, and you can
21 answer it in whatever way you think is appropriate,
22 doctor. I don't want to misquote you. I want to
23 know how much coronary artery disease there was in
24 Mr. Evans, and you can reflect it in any way you

42

1  can.  We are starting with the right coronary artery
2  just because you have two slides in front of you.
3      Can you identify on the heart, either in a
4  picture or verbally, how much coronary artery
5  disease there was in Mr. Evans?
6      A.   Yes, I can, but we wouldn't have needed the
7  deposition tonight, because it's very accurately
8  described in my report in thg.14th of August, 2003.
9  So if you want to know the answer to your question,
10 it's there in black and white and you've had that
11 answer for the past three months.  What do you want
12 me to do beyond the written answer that you've had
13 for three months?
14     Q.   Can you refer me to a paragraph in your
15 report, please, which indicates the extent of
16 coronary artery disease in each of the vessels of
17 Mr. Evans' heart?
18     A.   My report of 1 May 2003, Page 2, Paragraph
19 2.
20     Q.   With all due respect, maybe it's clear to
21 you.  You are a pathologist at Harvard. I'm not. I
22 see where there is a description of an occlusion. I
23 do not see anything which indicates the length of
24 the occlusion and how much of the total arterial

43 f

1  supply in Mr. Evans' heart is affected by coronary
2  artery disease. Do you have an answer for that or
3  do you rely just on the information that you've
4  already provided in your reports?
5      A.   If one has a 100 percent occlusion, that is
6  100 percent. The blood is not going through.
7  That's the important issue.  Whether that 100
8  percent occlusion stretches out for one millimeter
9  or five centimeters is not important in terms of
10 causing acute myocardial infarction. That's my
11 answer.
12     I've already answered how much of the right
13 coronary artery was involved based on my diagram and
14 your prior question and my prior answer was several
15 centimeters.
16     Q.   Are you going to be expressing any opinion
17 to a reasonable degree of medical probability as to
18 the extent of coronary artery disease in the right
19 coronary artery that could have been bypassed or
20 successfully treated with an angioplasty or
21 stenting?
22     A. If asked, I would do my best to answer it.
23     MS. LTTTLEPAGE: Yes.
24     Q.   I want the doctor to say.  What is your

44

1  opinion?
2      A.   Persons that have total proximal
3  obstruction generally can have a surgeon attempt an
4  angioplasty, and beyond that, I don't know, but
5  usually one can find something to anastimose, and
6  the pathology indicates that the proximal arteries
7  are completely occluded, and therefore, it's
8  potentially possible to get around the proximal
9  occlusion.
10     Q.   You said possible. Do you have an opinion
11 to a reasonable degree of medical probability or
12 will you defer to the doctors in this case who
13 actually do the surgeries or do the procedures?
14     A. I don't believe this patient had surgery,
15 and to defer, I would have to know the persons and
16 their basis for their judgments and conclusions, and
17 then I may or may not defer.
18     Q.   Have you been provided any verbal
19 information about what other experts are going to
20 say in this case?
21     A. I have been provided information that there
22 is a cardiac surgeon who is going to say this was a
23 potentially treatable patient in terms of surgery.
24     Q.   So you don't know whether anyone is going

1 (Pages 140 to 143)

140

1          VOL. 2, PAGES 140-202
2       UNITED STATES DISTRICT COURT
3       FOR THE DISTRICT OF MARYLAND
4    Civil Action No. MJG-02-CV-788
5    --"~-  ------  ---`--`--`--~-
6    JUDITH A. EVAN, et al.,      )
7          Plaintiffs      )
8    v.                )
9    NEIL PADGETT, M.D., et al.,   )
10          Defendants    )
II   _---------  -_----  __-----_-__
12
13   CONTINUED TELEPHONE DEPOSITION OF EUGENE MARK, M.D.
14       Monday, December 8, 2003
15          7:04 a.m.
16        8 Winslow Road
17     Winchester, Massachusetts 01890
18
19         *······  .
20
21
22    Reporter: Lauren M. Mitchell, CSR, RPR
23
24

142

APPEARANCES (via telephone):
    Wharton, Levin, Ehrmantraut & Klein
    Douglas K. Schrader, Esq.
     104 West Street
    Annapolis, Maryland 21404-0551
    (401) 463-5900

141

1    APPEARANCES (via telephone):
2       Diane M. Littlepage, P.A.
3       Diane M. Littlepage, Esq.
4        1406B South Crain Highway, Suite 207
5       Glen Burnie, Maryland 21061
6       (410) 787-7009
7       Counsel for the Plaintiffs
8          -
9       Wilson, Elser, Moskowitz,
10      Edelman & Dicker, LLP
11      Shadonna E. Hale, Esq.
12      400 East Pratt Street, Suite 4300
13      Baltimore, Maryland 21202
14      (410) 962-7023
15      Counsel for James Ronan and
16      Cardiovascular Associates, P.A.
17
18      Anderson, Coe & King
19      J. Michael Slonekar, Esq.
20      201 N. Charles Street, Suite 2000
21      Baltimore, Maryland 21201-4102
22      (401) 752-1630
23      Counsel for Neil Padgett, M.D.
24      and Maryland Primary Physicians

143

I INDEX

WITNESS                    PAGE
EUGENE MARK, M.D.
BY MR. SLONEKAR:           144
BY MR. SCHRADER:           172
BY MS. HALE:            180

EXHIBITS
    None.

EXHIBIT

    a

TELEPHONE DEPOSITION OF EUGENE MARK, M.D., VOLUME 2
CONDUCTED ON MONDAY, DECEMBER 8, 2003

14 (Pages 192 to 195)

192

1    Q. You said there was treatment to prevent that
2  type of arrythmia. I believe you mentioned a
3  defibrillator.
4        Do you recall that?
5    A. I do.
6        As I recollect, in the deposition, you
7  asked me about treatment. And I indicated the
8  pacemaker to prevent ventricular arrhythmias.
9        I believe you asked me subsequently
10  about medical treatment, and was there also medical
11  treatment.
12        And I said yes. And I believe that's as
13  far as we got into the treatment.
14    Q. When you reviewed the literature for today,
15  did those two textbooks go into that type of
16  treatment?
17    A. One of the two does, yes.
18    Q. Which one?
19    A. The one by Goldman and Braunwald.
20    Q. Okay. Are you going to be testifying at
21  trial regarding the treatment to prevent an
22  arrythmia that may cause the death of patients in
23  HCM and why you do not believe such an anythmia
24  occurred in this case?

193

1    A. Those are two very different questions.
2    Q. We can break them down.
3    A. Please.
4    Q. Are you going to be testifying regarding
5  treatment to prevent arrhythmias in patients with
6  HCM?
7    A. I feel capable of expressing my opinions.
8        I don't anticipate lfeing asked that
9  question. And that's the best I could do to answer
10  your question.
11        MS. HALE: Diane, are you going to ask
12  him about that at trial?
13        Otherwise, I can go on.
14        MS. LITTLEPAGE:  I intend to ask him
15  about the treatment of patients with HCM.
16    Q. Okay. And Dr. Mark, I understand in this
17  case, you're of the opinion that there was no
18  arrythmia that caused the death which was associated
19  with HCM.
20        Correct?
21    A. No. I think it would be more fair to say
22  that whatever the terminal arrythmia was in this
23  case, I believe it was due principally to the
24  coronary occlusion and the acute myocardial

194

1  infarction.
2    Q. All right.
3        And that is simply based on your
4  recording the occlusions of the artery?
5    A. It's based on my finding of the occlusions
6  in the arteries, the myocardial necrosis.
7        And it's based, in part, on the
8  philosophical principle expressed in Dr. Goldman and
9  Dr. Braunwald's literature that the autopsy is the
10  gold standard for determining cardiac conditions.
11    Q. So, in terms of how diabetes affects
12  coronary artery disease, you mentioned that in your
13  May I report.
14        Was there anything else you recall that
15  you saw or that you would expect to see in a patient
16  who has diabetes and coronary artery disease
17  together?
18    A. The most common condition that is seen in
19  patients with diabetes are changes in the kidneys.
20  And those changes were not present.
21    Q. Okay. In terms of the family history of
22  Mr. Evans, at what age would be significant of a
23  parent having an MI?
24        THE WITNESS: Would you please read that

195

1  back to me, Ms. Court Reporter?
2    Q. I can just rephrase it.
3        In terms of risk factors, is there a
4  certain age which is considered to be significant in
5  terms of a parent having an MI?
6    A. There is. There is literature that gives
7  rather precise numbers. The earlier, the more
8  significant.
9        To answer your question as best I can
10  30s or early 40s would be considered raising one's
11  suspicion of having this heritable condition. The
12  age would also depend on the sex in that that would
13  also be significant.
14        And as I recall, some specific numbers,
15  to answer your question, are given in the Goldman
16  book, but I don't remember the exact numbers that
17  they use.
18    Q. Okay. I take it you're of the opinion that
19  there was no ischemia of the gut in this case?
20    A. That is correct.
21    Q. What would you have been looking for in
22  order to make that determination?
23    A. To appreciate ischemia of the bowel, one
24  would essentially see gangrene. That is, when the

~girhari}   _   rieblaxtber,        JcA0C

1056 Fifth Avenue #10C
New York, NY 10028


PHONE (917) 846-9853
FAX (413) 832-4638
EMAIL rpfriedlandermd@rnsn.com

July 10, 2002

# MEDICAL REVIEW

# RE: Robert Evans

Ⅰ.     Documents Reviewed

    Records of Doctor Marc Okum:  7/14/00-8/28/00
    Records of Doctor Batcha: 1/13/99-3/29/99
    Records of Doctor Padgett: 6/19/00-10/4/00
    Records of North Arundel Hospital: 10/4/00
    Autopsy of Robert Evans: 1015/00
    Death Certificate of Robert Evans

II.     Summary of Case

    The patient was 45 years old when he first came under the care of Doctor Batcha in January 1999.  The medical history at that time was noteworthy for presumed hypertrophic cardiomyopathy diagnosed in 1994. The patient had previously smoked one pack per day for 28 years but had discontinued this habit in 1997. Pulmonary function studies obtained in 1997 and again in 1998 had demonstrated mild to moderate restriction with a near normal $FEV_i/FVC$.  A CT scan of the chest in March 1998 was interpreted as being normal while the exertional pulse oxymmetry recorded in December 1998 was 99%.  Furthermore a chest X-ray at that time was unremarkable. Doctor Batcha concluded though that the patient had bronchial asthma and treated him with bronchodilators. Several weeks later his dyspnea and cough were reported improved however repeat pulmonary function studies revealed only mild restriction without any significant change after administration of bronchodilators.

    Two months later Doctor Batcha discontinued all pulmonary medications and according to a letter authored by Doctor James Ronan on March 19,1999, the patient was somewhat improved.  Apparently Doctor Ronan obtained an echocardiogram, which demonstrated only a minimal left ventricular outflow gradient.  The patient was thereafter begun on verapamil to reduce both the heart rate and the blood pressure.

Mr. Evans next saw Doctor Padgett on June 19, 2000 with dyspnea. Bibasilar "crackles" were treated with Lasix however by the following day, the patient's dyspnea had worsened and he was admitted to North Arundel Hospital by Doctor Marc Okum. An echocardiogram apparently demonstrated mild left ventricular hypertrophy with normal systolic function as well as mild mitral insufficiency. Cardiac enzymes were unremarkable and Doctor Okum concluded that the patient had congestive heart failure as a consequence of diastolic dysfunction. After treatment with intravenous Lasix, Mr. Evans' dyspnea improved.

One week after discharge the patient was again seen by Doctor Padgett who noted a 14-pound weight gain in only seven days as well as fatigue. Zaroxyln was added to his regimen and his dyspnea apparently unproved.

During this period, Mr. Evans was again seen by Doctor Okum. On July 14, 2000, an ECG performed by Doctor Okum demonstrated an inferior wall infarction as well as a possible septal infarction. Also of note several days later was a cholesterol of 281-mg.%. as well as triglycerides of 1,460-mg.%. Doctor Okum chose to treat the patient with low dose Lopressor at thus time.

When seen by Doctor Padgett on August 22nd, a reference to gastritis diagnosed by endoscopy is noted in the medical record. A month later both his dyspnea and "GERD" were described as improved although two weeks later on October 3rd, the gastric reflux was noted to have worsened, prompting treatment with Nitrodur.

The following day the patient returned to Doctor Padgett with a blood pressure of 80/64. The ECG revealed new atrial fibrillation, mild ST segment elevations in the inferior leads as well as ST depression in $V_6$. Mr. Evans was immediately referred to North Arundel Hospital for admission.

Upon entry to the hospital, the patient initially responded to intravenous fluids and dopamine. Cardiac enzymes were normal however the ECG was noteworthy for a new left bundle branch block. Also of note was a severe metabolic acidosis. The patient apparently arrested and was successfully intubated and resuscitated. Thereafter he again became unresponsive and died despite appropriate advanced life support measures. Blood cultures reported after the patient's demise were unremarkable.

The autopsy performed on October S, 2000 by Doctor F.C. Rodriguez demonstrated left and right ventricular hypertrophy as well as cardiomegally with extensive old infarction as well as early septal and left ventricular necrosis. The right coronary artery was completely occluded while the left coronary artery was described as 95-98% narrowed. The only pulmonary pathology was patchy subpleural emphysema as well as pulmonary edema. No mention was made of hypertrophy cardiomyopathy.

111.    **Discussion**

It is my professional opinion, based upon a reasonable degree of medical certainty that Doctors Batch, Padgett and Okum departed from accepted medical practice in their care and treatment of Mr. Robert Evans.

The patient was known to have multiple cardiac risk factors including diabetes, hyperlipidemia, cigarette **smoking,** obesity, hypertension, male sex and age greater than 40 years. Furthermore ECG's dating as early as July 2000 clearly demonstrated inferior wall and possibly septal infarction.    The patients recurrent complaints of exertional dyspnea were probably an anginal equivalent since his pulmonary insufficiency was clearly too insignificant to explain his symptoms.   The patient's pulmonary function studies obtained in January 1999 were indicative of only mild restrictive disease.   Furthermore, the pulse oaymmetry obtained during exercise was entirely within normal limits at 99%.    I also note that left ventricular function by echocardiographic examination on June 21, 2000, was described as normal.

The patient should have been referred for a dobutamine echocardiographic stress test. Such an examination would almost certainly have identified Mr. Evans' critical coronary artery disease.   There is every expectation that timely revascularization would have prevented the patient's untimely death on October 4, 2000 as well as the extensive left ventricular injury documented at autopsy.

In summary I am of the opinion that Mr. Robert Evans physicians departed from accepted medical practice when they individually failed to consider myocardial ischemia as the etiology for the patient's recurrent complaints of dyspnea.   Had a dobutamine exercise stress test been performed, the patient's critical coronary artery disease would have been identified in a timely fashion thus permitting revascularization in time to prevent the severe left ventricular injury identified at autopsy as well as the patient's untimely death.

The opinions expressed in this report should be considered preliminary pending review of further medical records as well as sworn deposition testimony.

Richard P. Friedlander, M.D. F.A.C.C.

RPF/zmg
Enclosure

# In The Matter Of:

*E VANS v.*

*PADGETT*

*RICHARD FRIEDLANDER*

*October 21, 2003*

*FINK & CARNEY*

*REPORTING AND VIDEO SERVICES*

*39 WIEST 3 7TH STREET*

*NEW* YORK, NY USA 10018

(212) 869-1500 or (800) 692-3465

*Original File AF1021.TXT, 227 Pages*
*Min-U-Scrlpt© File ID: 0410712275*

# Word Index included with this Min-U-Script®

**EXHIBIT**

Page 1

[1]
[2]        UNITED STATES DISTRICT COURT
[3]        FOR THE DISTRICT OF MARYLAND
[4]
     JUDITH A. EVANS, et al.,

          Plaintiffs,
[6]
[7]        -against-          No. MJG
                              02-CV-788
[8]   NEIL PADGETT, M.D., et al.,
[9]          Defendants.
[10]
[11]
[12]   DEPOSITION OF RICHARD P. FRIEDLANDER, M.D.,
[13]   taken by Defendants at the offices of Richard P.
[14]   Friedlander,1056 Fifth Avenue, New York, New York, on
[15]   Tuesday, October 21, 2003, commencing at 2:20 o'clock
[16]   p.m., before ANNETTE FORBES, a Certified Shorthand
[17]   (Stenotype) Reporter and Notary Public within and for
[18]   the State of New York.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2]   APPEARANCES:
[3]
          DIANE M. LITTLEPAGE, P.A.
[a]          Attorneys for Plaintiffs
             Crain Professional Building
[5]          1406B Crain Highway, Suite 207
             Glen Burnie, Maryland 21061

          BY:  DIANE M. LITTLEPAGE, ESQ.
[7]
[8]   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER,
          LLP
[9]       Attorneys for Defendant Dr. Ronan and
                Cardiovascular Associates
[10]         400 East Pratt Street, Suite 430
             Baltimore, Maryland 21202
[11]

          BY:  SHADONNA E. HALE, Esq., of Counsel
[12]
[13]
          Messrs. ANDERSON, COE & KING, LLP
[14]      Attorneys for Defendant Dr. Padgett
          201 North Charles Street, Suite 2000
[15]         Baltimore, Maryland 21201
[16]   BY: J. MICHAEL SLONEKER, Esq., of Counsel
[17]
[18]      Messrs. WHARTON, LEVIN
          Attorneys for Defendants Drs. Batcha &
[19]            Okun
             104 West Street
[20]         P.O. Box 550
             Annapolis, Maryland 21403
[21]
          BY:  A. GWYNN BOWIE, JR., Esq., of Counsel
[22]
[23]
[24]
[25]

Page 87

*Friedlander*

life expectancy would have been, correct, barring the coronary artery disease?

A: I am going to be expressing an opinion regarding coronary artery disease. Why would I express an opinion on a disease that doesn't have --

Q: You are already expressing opinions regarding treatment of coronary artery disease. I am asking you follow up -

A: We can do this another 20 times if you like.

As I explained to you, he could have gotten the beta blocker, because Dr. Ronan thought *he* had IHSS.

So, therefore, yes, expressing that opinion in any way, shape or form means I believe he had the disease.

Q: I understand that.

A: You keep coming back to it, going over and over it again. In other words, I don't know how. I am trying to cooperate with you.

Q: I'm going to keep asking the question.

A: Absolutely. I will answer it

Page 88

*Friedlander*

another 20 times if you like.

Q: Let's jump to the coronary artery disease.

What was Mr. Evans' life expectancy that you intend to express to a reasonable degree of medical probability in October 2000?

A: Once again, recognizing that we don't have the specific anatomy of his coronary arteries, it is my opinion that without question his short and midterm prognosis was excellent if lie was revascularized and if he was treated appropriately and if his cardiac risk factors were brought under control.

By midterm, I'm talking about certainty ten years.

Looking at long-term prognosis, one has to understand that coronary disease is a dynamic disease. So even if you revascularize his existing lesions, that is not to say he can't develop new lesions.

Stich an individual requires full monitoring by a qualified Internist or cardiologist. Risk factors such as cholesterol, 281; weight loss, he had lost weight anywhere from

Page 89

*Friedlander*

332 down to 280 at one point. He had stopped smoking. I believe he had stopped drinking. His wife made reference to earlier drinking, I didn't see a late reference to it.

He was a fairly cooperative guy and assuming he continued to cooperate, take his medicines, see his doctor, there is every expectation that even if he developed a new lesion that the new lesion could have been treated in a timely fashion.

But we all know that people with pal coronary disease can suddenly drop dead. There's no absolutes regarding his life expectancy.

Q: What is the likelihood that he would have lived another ten years?

A: Excellent. Excellent. I won't give any number, but, well, well in excess of 51 percent.

Q: That's a -

A: I don't think that data is available. People talk in terms of years. You really can't say someone is going to live 7.35 years. You can talk about population on average living a number of years.

Page 90

*Friedlander*

Q: As far as you know, regarding life expectancy over ten years, the prognosis was very likely.

A: Excellent.

Q: That's as far as you can go regarding life expectancy?

A: I said for longtime survival, I believe his prognosis was good, but recognizing that people with coronary disease can develop sudden death and myocardial infarction, but we know coronary lesions don't develop in a gradual fashion, they develop in a quantum fashion,

You can go from a 10 percent lesion to a 90 percent lesion like that, because of plaques.

So what is to say he couldn't do that?

Q: In fact, that is what occurs in most MI's, there is a sudden rupture of plaque?

A: I agree.

Q: It's not a gradual narrowing of the arteries that actually causes an MI; is that correct?

# DunAL LmUPA GE, P.A.

**Crain Professib vi Hwlding**
**1406 H sa A Cram Hotr*Y• 8utce 207**
Glen &rt*. Merylend 21061
**Tg(410) W•7009**
**fim(410) 787•7090**
**Tea Foul (8Sb? 876-7317**

TWtinut<
tweWIV&FAWM
aoadtmtd a 0rn

WMAllW7J1MlJ

MMAM
n    0bUJW

**July 10, 2002**

_17A_ _FA CRMILE OWL Y_

**Richard Friedlanda, M.D.**
**1056 5th Avenue**
_New York, NY 10028_

RE: _Robert Evans_

_Dear Dr. Friedlande_ :

Per our conversation earlier today in regards to your review of Mr. Evansl records, plcasa include in your report that this is just a prelimiaacy report.  We stilt may have additional information _to sendyou sash as the_ defendants and other experfs deposition testimony.  At your convenience please fax back to our offices.

We greatly sppreclW your assistance in this matter_  Should you have any questions or      re additional information, please feel fce to contact me at our offices.

Vary truly yours,

Y

Exhibit
No.

Ω 12 1    O        ~---

EXHIBIT

a
9